Scarlett v. Barr

# In the
# United States Court of Appeals
## for the Second Circuit

---

AUGUST TERM 2019

No. 16-940

LESTON AUGUSTUS SCARLETT,
*Petitioner-Appellant*,

v.

WILLIAM P. BARR, United States Attorney General,
*Respondent-Appellee*.

---

On Appeal from the Board of Immigration Appeals

---

ARGUED: OCTOBER 30, 2019
DECIDED: APRIL 28, 2020

---

Before: CABRANES and RAGGI, *Circuit Judges*, and KORMAN, *District Judge*.[*]

---

[*] Judge Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

On a petition for review of a Board of Immigration Appeals ("BIA") decision upholding an order of removal, petitioner challenges the denials of his applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). As to asylum, petitioner faults the BIA for not allowing him to reopen proceedings to cure record deficiencies that he attributes to the ineffective assistance of counsel and that he maintains show extraordinary circumstances excusing the untimeliness of his asylum application. As to withholding, petitioner argues that the agency erred in finding that he failed to show a reasonable fear of persecution from (1) former supervisors in the Jamaican police force, and (2) criminal gang members. In particular, petitioner charges the agency with legal error in assessing whether Jamaican authorities were *unwilling* or *unable* to protect him from gang violence. Petitioner similarly challenges the denial of CAT relief.

We identify no error in the agency's rejection of petitioner's untimely asylum claim. We also identify no error in its denial of withholding or CAT protection insofar as petitioner professes fear of persecution and torture from former police supervisors. Insofar as he seeks withholding and CAT protection based on feared persecution and torture from gangs, however, the record does not permit us to determine whether the agency considered all relevant evidence and applied the correct legal standard. Accordingly, we vacate the agency's denials in this respect and remand for further proceedings consistent with this opinion and with the Attorney General's decision in *Matter of A-B-*, 27 I. & N. Dec. 316 (Att'y Gen. 2018).

PETITION GRANTED; BIA DECISIONS AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

_____

HANNAH MILLER (Vilia B. Hayes, *on the brief*) Hughes Hubbard & Reed LLP, New York, New York *for Petitioner*.

LINDSAY M. MURPHY (Benjamin C. Mizer, Andrew N. O'Malley, *on the brief*) United States Department of Justice, Office of Immigration Litigation, Washington, District of Columbia *for Respondent*.

---

REENA RAGGI, *Circuit Judge*:

Leston Augustus Scarlett is a Jamaican national and former Jamaican police officer who petitions this court to review two decisions of the Board of Immigration Appeals ("BIA") that, collectively, uphold Immigration Judge ("IJ") orders directing Scarlett's removal from the United States and denying his requests for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). *See In re Leston Augustus Scarlett*, No. A206 471 586 (B.I.A. June 11, 2015 & Mar. 8, 2016), *aff'g* No. A206 471 586 (Immig. Ct. Batavia Oct. 23, 2015 & Feb. 5, 2015). Insofar as Scarlett's request for asylum was rejected as untimely, he argues that the BIA erred in denying him leave to reopen based on the ineffective assistance of former counsel in failing to demonstrate that extraordinary circumstances excused the late filing. In challenging the denials of withholding and CAT relief, Scarlett charges the agency with legal error in concluding that he (1) lacked a

3

reasonable fear of future persecution[1] or torture in Jamaica from former police supervisors and (2) failed to show that Jamaican authorities were "unwilling or unable" to protect him from feared violence by Jamaican gangs so as to charge the government itself with persecution or torture.

We grant Scarlett's petition for review and, upon such review, we affirm the agency's decisions to deny asylum without ordering remand. We further affirm the agency's denial of withholding and CAT relief as to Scarlett's professed fear of persecution or torture by police supervisors. As to feared gang violence, however, the existing record raises concerns as to whether the agency considered all relevant evidence and applied the correct legal standards when it rejected Scarlett's claim that such violence equated to government persecution or acquiescence in torture because Jamaican authorities were unwilling or unable to protect him from gangs. We are mindful that, at the time of the challenged decision, the agency did not have the benefit of *Matter of A-B-*, 27 I. & N. Dec. 316 (Att'y Gen. 2018),

---

[1] The term "persecution," used in authorizing claims for asylum, 8 U.S.C. § 1101(a)(42)(A), *see id.* § 1158(b)(1)(A)–(B)(i), is frequently also used to reference the "threat" to "life or freedom" required to secure withholding of removal, *id.* § 1231(b)(3). *See, e.g., INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987) (holding that to show threat to life or freedom, alien seeking withholding must demonstrate "it is more likely than not that [he] would be subject to persecution" in country of removal (internal quotation marks omitted)); *Paul v. Gonzales*, 444 F.3d 148, 155 (2d Cir. 2006) (stating that "withholding of removal . . . may only be requested on the basis of a probability of future persecution"); *Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 339 (2d Cir. 2006) (observing that "concept of persecution inheres in the analysis of both asylum and withholding of removal" claims). Thus, we use the word "persecution" throughout this opinion in discussing Scarlett's challenge to the denial of his withholding claim.

which clarifies the "unwilling or unable" standard. Accordingly, we vacate so much of the agency's challenged decisions as deny Scarlett withholding of removal and CAT protection based on gang persecution and torture, and we remand the case for further consideration of these claims consistent with this decision and *Matter of A-B-*.

## BACKGROUND

Petitioner Leston Augustus Scarlett is a citizen of Jamaica who, for fifteen years, served as an officer of that country's Constabulary Force. Scarlett claims that fear of persecution by former police supervisors and gang members prompted him to leave Jamaica and enter the United States on July 9, 2010. Scarlett did not mention any fear of persecution to United States authorities when he entered this country on a B-2 non-immigrant visa, nor did he do so at any time before his visa expired on January 8, 2011. Instead, Scarlett remained in this country without authorization, coming to the attention of federal immigration authorities only after being convicted in New York in 2014 of disorderly conduct resulting from a domestic dispute. *See* N.Y. Penal Law § 240.20(1). The Department of Homeland Security ("DHS") then charged Scarlett with removability under the Immigration and Nationality Act ("INA") § 237(a)(1)(B), *see* 8 U.S.C. § 1227(a)(1)(B), for having overstayed his visa. At the ensuing immigration proceedings, Scarlett, through counsel, conceded removability, but applied for relief in the form of asylum, withholding of removal, and CAT protection.

5

## I.     Fear of Police Persecution

Scarlett sought such relief based on his professed fear of persecution from former police supervisors if returned to Jamaica. To explain that fear, Scarlett testified that in 2005, after already serving a decade in the Jamaican Constabulary Force, he was assigned to a special squad in Denham Town that investigated murders and shootings. Scarlett testified that the squad leader, Superintendent Delroy Hewitt, was corrupt, falsifying police reports to conceal misconduct and using officers to perform contract murders. When, in 2006, Hewitt asked Scarlett to perform such a contract murder, he refused.[2]

Thereafter, on two occasions—once in 2008, and again in 2009—Hewitt verbally abused Scarlett for taking suspects into custody rather than killing them. The suspect Scarlett arrested in 2008 was a member of the Jamaican Labour Party ("JLP"), and Hewitt accused Scarlett of not killing the suspect because of Scarlett's own support for that party.[3] Hewitt made a similar accusation in connection with the 2009 arrest. On that occasion, Hewitt and other

---

[2] In the absence of any adverse finding by the agency or challenge from the government, we assume the credibility of Scarlett's testimony. *See* 8 U.S.C. § 1158(b)(1)(B)(iii).

[3] Hearing evidence—including a State Department Country Report—indicated that Jamaica's two major political parties, the JLP and the People's National Party ("PNP"), sometimes use gangs to further political aims. The gangs most frequently affiliated with the JLP are the "Shower Posse" and the "One Order"; the gang most frequently associated with the PNP is the "Spanglers." Scarlett testified that he has never been affiliated with any political party or even voted in a Jamaican election.

squad members surrounded Scarlett as Hewitt told Scarlett that he posed a danger to the entire squad. Scarlett testified that he began to fear for his life, particularly because, the previous year, he had heard squad members bragging about killing a police officer.

At about this time, Scarlett suspected that Hewitt was having him surveilled. On two occasions Scarlett reported the suspected surveillance by calling Jamaica's emergency services number. Responding police discovered that the occupants of the suspected surveillance vehicle were, indeed, persons associated with Hewitt's squad, including another supervisor, "Harry J.," all of whom denied that they were following Scarlett.

In March of 2009, Scarlett requested, and was granted, a transfer out of Hewitt's squad. He was reassigned to the Guanaboa Vale division, some 20 miles from Denham Town. He testified to no further harassment or threats by police officials generally, or Hewitt in particular.

## II.     Fear of Gang Persecution

Scarlett also sought withholding and CAT relief based on feared gang violence. He testified that, after transfer to Guanaboa Vale, he was threatened by gang members. The first incident occurred after Scarlett seized firearms from the scene of an October 2009 shooting. Within days of the seizure, Scarlett observed a white Toyota driving by his home. Scarlett identified the vehicle's occupants as members of the Shower Posse because they used certain gang signs and the word "Shower" as they accused Scarlett of being a "police boy" and threatened to kill him if he did not return their guns.

7

The second incident happened a month later, in November 2009, after Scarlett shot and killed the leader of the One Order gang in the course of responding to another shooting scene. Two days later, Scarlett saw the same white Toyota approach his home. This time the vehicle's occupants not only verbally threatened Scarlett's life and home, but also fired a gunshot. Scarlett called emergency services, but by the time police arrived, the car had left the scene.

Fearing for his and his family's lives, Scarlett took his family into hiding, staying for brief periods with various neighbors and friends. When Scarlett sought police assistance, Superintendent Aston Thompson told him there were "no resource[s]" to help him. Admin. R. 1499–1500. Thompson did offer, however, to transfer Scarlett to the Bog Walk police station, four miles away from Guanaboa Vale. Scarlett accepted the transfer.

While assigned to Bog Walk, Scarlett experienced no direct threats, but neighbors told him of people driving in and out of the neighborhood asking as to the whereabouts of Scarlett and his family.

Then, one afternoon in January 2010, police intelligence officers contacted Scarlett and told him that One Order gang members were then en route both to his daughter's school to kidnap the child and to Scarlett's home to shoot it up and set it on fire. Scarlett testified that the police did not provide him with any assistance but, rather, told him that he was "on [his] own." *Id.* at 542. Scarlett promptly picked up his children and never again sent them to school in Jamaica. Instead, he and his family continued to hide while Scarlett sought permission to leave Jamaica.

8

Scarlett testified that departure permission was required because he was a police officer. He stated that permission was initially denied because, in early 2010, Jamaica was then requiring all members of its Constabulary to be available to assist in the apprehension of notorious Shower Posse leader Christopher "Dudus" Coke, whose extradition was then being sought by the United States.[4] Following Coke's June 2010 arrest, Scarlett was granted permission to leave Jamaica and, thus, arrived in the United States with his family on July 9, 2010.

### III. Events Following Scarlett's Entry into the United States

As earlier noted, Scarlett did not seek asylum from United States authorities upon entering this country or at any time while his non-immigrant visa was in effect. Scarlett testified, however, that approximately one month after arriving in the United States, he contacted Catholic Charities in Manhattan, which helped him obtain legal counsel to pursue an asylum application. Scarlett professed to have been unaware that no timely application was ever filed on his behalf. He never inquired into the matter because his attention was then focused on various hardships resulting from his own reduced economic circumstances and his wife's cancer diagnosis. At some point, the couple separated, with Scarlett moving to Illinois to live

---

[4] Police arresting Coke encountered considerable armed resistance, and some 73 civilians were killed in the ensuing shoot-out.

9

with his brother, while his wife and children resided in a different state.

Scarlett testified that, sometime after the separation, he learned that his wife was abusing their children and trafficking drugs. An altercation between the couple resulted in Scarlett's arrest and 2014 New York conviction for disorderly conduct.[5]

Meanwhile, in 2013, Scarlett heard from a friend in Jamaica that gang members were still looking for him in order to kill him.

## IV. Removal Proceedings
### A. The IJ's February 5, 2015 Decision

On September 26, 2014, DHS charged Scarlett with removability and served him with a Notice to Appear. Scarlett complied and, through counsel, conceded removability but sought relief in the form of asylum, withholding of removal, and CAT protection.

By order dated February 5, 2015, the IJ rejected Scarlett's asylum application as time barred, explaining that he had failed to file for that relief within one year of entering the United States as required by the applicable statute of limitations, *see* 8 U.S.C. § 1158(a)(2)(B), or to show "extraordinary circumstances" excusing his delay, *id.* § 1158(a)(2)(D); *see Xiao Ji Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 330 (2d Cir. 2006).

---

[5] Scarlett's wife passed away in 2015, and Scarlett assumes (but does not know) that his children are residing in Florida with his late wife's brother.

10

The IJ also denied Scarlett withholding of removal. Insofar as Scarlett sought such relief based on feared persecution by former police supervisors, the IJ found that Scarlett failed to show past persecution or a well-founded fear of future persecution by such persons. Insofar as Scarlett sought such relief based on feared gang persecution, the IJ found that any threat of harm was incidental to Scarlett's work as a police officer and not based on a protected ground. *See* 8 U.S.C. § 1231(b)(3)(A) (identifying "race, religion, nationality, membership in a particular social group, or political opinion" as protected grounds); *Matter of Fuentes*, 19 I. & N. Dec. 658, 661 (B.I.A. 1988) (stating that "dangers the police face are no more related to their personal characteristics or political beliefs than are the dangers faced by military combatants").

Similarly, the IJ denied Scarlett CAT relief because he failed to demonstrate past torture, or that it was more likely than not that he would be tortured with the acquiescence of the authorities if removed to Jamaica. 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a).

## B. The BIA's June 11, 2015 Decision

Proceeding *pro se*, Scarlett appealed to the BIA, arguing that he had demonstrated feared persecution based on the protected ground of political opinion because police supervisors targeted him based on imputed political support for the JLP, while JLP-connected gangs targeted him for imputed political support of the PNP. *See Hernandez-Chacon v. Barr*, 948 F.3d 94, 104 (2d Cir. 2020) (recognizing that "imputed political opinion, whether correctly or incorrectly attributed," can constitute ground of political persecution) (internal quotation marks omitted)).

11

While his appeal was pending, Scarlett moved the BIA to remand his case to the IJ for reopening so that he could cure the failure of his former counsel to demonstrate that extraordinary circumstances excused Scarlett's belated asylum application.

In its June 11, 2015 decision, the BIA denied Scarlett's motion to reopen, finding that he failed to show prejudice from former counsel's alleged ineffectiveness. The BIA explained that the evidence Scarlett faults counsel for omitting was largely duplicative of evidence already in the record. In any event, Scarlett failed to demonstrate due diligence in pursuing asylum, or to adduce corroborating evidence for the extraordinary circumstances that he claims prevented him from doing so, *e.g.*, his late wife's illness, abuse of their children, drug dealing, and scheme to have him falsely arrested.

As for Scarlett's appeal from the denial of withholding, the BIA identified no clear error in the IJ's finding that past verbal abuse and surveillance attributed to Scarlett's former police supervisors did not rise to the level of persecution. With respect to feared gang persecution, however, the BIA determined that remand was necessary because, although the IJ had found that gangs did not target Scarlett based on an imputed political opinion, the IJ had not considered the possibility that Scarlett was targeted due to membership in a particular social group based on the particular circumstances of his employment as a police officer. *See* Admin. R. 1055 (citing *Acharya v. Holder*, 761 F.3d 289, 302 (2d Cir. 2014) (discussing need to distinguish between "dangers commonly faced by police," as discussed in *Matter of Fuentes*, 19 I. & N. Dec. at 662, and "political dimension" of petitioner's particular police work)). Further, the BIA directed the IJ, on remand, to determine whether the

12

Jamaican government was willing and able to control gangs in light of record evidence about insufficient resources.

The BIA upheld the denial of Scarlett's CAT claim, concluding that he failed to demonstrate that, on removal, he would more likely than not be tortured "by or with the acquiescence of a public official or other person acting in an official capacity." *Id.* at 1056. Rather, the record showed that Jamaican police had "been responsive" to Scarlett's reports and "notified him when they became aware of threats against him." *Id.*

## C. The IJ's October 23, 2015 Decision

On remand, the IJ determined that Scarlett could not show a well-founded fear of gang persecution based on membership in a particular social group or on imputed political opinion because the threats he received arose as a result of his performance of duties as an active police officer. The IJ further rejected Scarlett's claim that Jamaican authorities were unwilling or unable to protect him, observing that, in response to gang threats, authorities offered to transfer Scarlett to the Bog Walk division, which Scarlett "did not wish to do." *Id.* at 316.

## D. The BIA's March 8, 2016 Decision

On appeal, the BIA upheld the IJ's denial of withholding. In doing so, the BIA declined to decide whether the particular circumstances of Scarlett's police employment warranted a departure from *Matter of Fuentes*. Rather, the BIA concluded that, even if Scarlett could establish past gang harm on account of a protected ground, he was not entitled to withholding because he failed to prove that

13

Jamaican authorities were unwilling or unable to protect him from such violence. The BIA specifically noted that police (1) "were able to warn [Scarlett] about impending harm to his family," and (2) "offered to transfer him to another location." *Id.* at 3.

## V.    Appeal to this Court

Still proceeding *pro se*, Scarlett timely appealed to this court, challenging the BIA's denial of (1) his motion to remand for further consideration of his asylum claim, (2) withholding of removal based on feared persecution by former police supervisors and Jamaican gangs, and (3) CAT relief. *Pro bono* counsel, appointed by this court to assist Scarlett, filed a supplemental brief challenging the agency's application of the unwilling-or-unable-to-protect standard to deny Scarlett withholding. *Amici curiae* also address the unwilling-or-unable standard.

### DISCUSSION

The standards of review applicable to the issues on this appeal are well established and can be stated briefly. We examine the BIA's denial of a motion to remand for reopening for abuse of discretion. We will identify such abuse only if the Board's decision inexplicably departs from established policies or is so devoid of rational explanation as to raise concern that it acted in an "arbitrary or capricious manner." *Li Yong Cao v. U.S. Dep't of Justice*, 421 F.3d 149, 157 (2d Cir. 2005) (internal quotation marks omitted). In reviewing denials of withholding claims under the INA or claims for relief under the CAT, we apply the substantial evidence standard to the agency's factual findings, "which we will uphold unless any reasonable adjudicator would be compelled to conclude to the contrary." *Shunfu*

14

*Li v. Mukasey*, 529 F.3d 141, 146 (2d Cir. 2008) (internal quotation marks omitted); *Mu Xiang Lin v. U.S. Dep't of Justice*, 432 F.3d 156, 159 (2d Cir. 2005). At the same time, we review *de novo* all questions of law, including the application of law to facts. *See Pierre v. Gonzales*, 502 F.3d 109, 113 (2d Cir. 2007); *Yan Fang Zhang v. Gonzales*, 452 F.3d 167, 171 (2d Cir. 2006). To the extent the BIA adopts the IJ's reasoning in denying relief, "we review the two decisions in tandem" in applying these standards. *Yanqin Weng v. Holder*, 562 F.3d 510, 513 (2d Cir. 2009); *see Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d 520, 522 (2d Cir. 2005).

## I.  Denial of Motion To Reopen

We identify no abuse of discretion in the BIA's decision to deny Scarlett remand to reopen his asylum claim. To the extent Scarlett supported his motion by claiming that former counsel rendered ineffective assistance before the IJ, the BIA correctly observed that Scarlett was required by *Matter of Lozada,* 19 I. & N. Dec. 637, 639–40 (B.I.A. 1988), both to satisfy certain procedural requirements and to demonstrate prejudice. The BIA found that Scarlett carried his procedural burden, but he failed to demonstrate prejudice. The record supports this conclusion.

To demonstrate prejudice, Scarlett had to make a *prima facie* showing that, but for counsel's ineffectiveness, "he would have been eligible for [asylum] relief," and "could have made a strong showing in support of his application." *Rabiu v. INS*, 41 F.3d 879, 882 (2d Cir. 1994). He failed in both respects.

The agency determined that Scarlett was not eligible for asylum because he failed to file for such relief within the applicable one-year

15

statute of limitations. *See* 8 U.S.C. § 1158(a)(2)(B).[6]   In seeking reopening, Scarlett maintained that he could have demonstrated eligibility but for counsel's failure to argue that extraordinary circumstances excused the delayed filing.   The BIA reasonably rejected this argument, noting the total lack of corroboration for the various domestic circumstances urged by Scarlett as extraordinary. *See* 8 C.F.R. § 1003.2(c)(1) ("A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material."); *Ajdin v. Bureau of Citizenship & Immigration Servs.*, 437 F.3d 261, 263 (2d Cir. 2006) (quoting Supreme Court's recognition that movant seeking to reopen immigration proceedings "bears a heavy burden" akin to that of a criminal defendant moving for a new trial on the basis of newly discovered evidence (quoting *INS v. Abudu*, 485 U.S. 94, 110 (1988))); *see generally Wei Sun v. Sessions*, 883 F.3d 23, 28 (2d Cir. 2018) (recognizing that "corroborating evidence may be required in certain circumstances" including where applicant "fails to put forth corroboration that should be readily available").

Further, and in any event, the BIA reasonably concluded that Scarlett failed to demonstrate his own diligence in pursuing asylum

---

[6] While courts generally lack jurisdiction to review the agency's finding that an asylum application is untimely, they are empowered to review constitutional claims such as Fifth Amendment challenges to the effective representation of counsel. *See Dong Zhong Zheng v. Mukasey*, 552 F.3d 277, 285 (2d Cir. 2009); *Rabiu v. INS*, 41 F.3d at 882 (explaining that, in immigration context, ineffective assistance claims are analyzed under Fifth Amendment Due Process Clause).   Thus, we here consider timeliness only insofar as it informed the BIA's determination that Scarlett was not prejudiced by former counsel's alleged ineffectiveness on that matter.

within a "reasonable period given those circumstances." 8 C.F.R. § 1208.4(a)(5); *see Rashid v. Mukasey*, 533 F.3d 127, 131–32 (2d Cir. 2008) (stating that "no matter how egregiously ineffective counsel's assistance may have been, an alien will not be entitled to equitable tolling unless he can affirmatively demonstrate that he exercised reasonable due diligence in pursuing his claim . . . both before *and* after he has or should have discovered [counsel's] ineffective assistance" (internal quotation marks omitted) (emphasis in original)). It was not until four years after Scarlett entered the United States, three years after his visa expired, and only after removal proceedings were initiated against him, that Scarlett applied for asylum. While he claims to have consulted with an attorney soon after his arrival in the United States about filing for asylum, the record shows that he made no effort to determine whether an application had actually been filed on his behalf until charged with removal.

Nor was Scarlett able to demonstrate that, but for counsel's ineffectiveness, he could have made a strong showing in support of asylum. As the BIA observed, the evidence Scarlett faults counsel for omitting—a new copy of his declaration, the 2007 State Department Country Report for Jamaica, and Reports from Amnesty International and Freedom in the World—was sufficiently "similar to and duplicative of" evidence already in the record and, thus, not likely to have added significant support to his asylum claim. Admin. R. 1054.

The BIA having thus reasonably explained why Scarlett failed to demonstrate prejudice from his attorney's purported ineffectiveness in urging extraordinary circumstances to excuse his delayed asylum filing, we conclude that the BIA acted within its

17

discretion in denying Scarlett's motion to remand his case for reopening.

## II.    Withholding of Removal

Subject to exceptions not relevant here, the INA states that an alien may not be removed "if the Attorney General decides that the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). Thus, "[t]o establish . . . eligibility for withholding of removal, . . . an applicant must show that it is more likely than not that he would suffer [such] future persecution if returned to the country of removal." *Hongsheng Leng v. Mukasey*, 528 F.3d 135, 141 (2d Cir. 2008) (internal quotation marks and alterations omitted); *see* 8 C.F.R. § 1208.16(b)(2). The withholding standard is "concerned only with objective evidence of future persecution"; it has no "subjective component." *Paul v. Gonzales*, 444 F.3d 148, 155–56 (2d Cir. 2006). Nevertheless, "[a] rebuttable presumption of withholding eligibility attaches to an applicant who demonstrates that [he] suffered past persecution based on one of the enumerated grounds." *Li Hua Lin v. U.S. Dep't of Justice*, 453 F.3d 99, 105 (2d Cir. 2006).

To qualify as "persecution" the conduct at issue must be attributable to the government, whether directly because engaged in by government officials, or indirectly because engaged in by private persons whom the government is "unable or unwilling to control." *Pan v. Holder*, 777 F.3d 540, 543 (2d Cir. 2015); *Rizal v. Gonzalez*, 442 F.3d 84, 92 (2d Cir. 2006) ("[P]ersecution can certainly be found when the government, although not itself conducting the persecution, is

unable or unwilling to control it."). Scarlett claims to have an objectively reasonable fear of future persecution if removed to Jamaica because he suffered past persecution both directly from former police supervisors and indirectly from Jamaican gangs that the government was unwilling or unable to control. We uphold the agency's denial of withholding on the first basis, but we conclude that the second requires remand for further consideration.

## A. Former Police Supervisors

Scarlett testified that he suffered past persecution from former police supervisors after refusing to participate in a contract murder and reporting unlawful police behavior. Specifically, Scarlett complains of verbal harassment and visual surveillance that he understood implicitly to threaten his life. Even crediting this testimony, the agency was not compelled to find past persecution. As this court has observed, "[u]nfulfilled" threats alone generally do not rise to the level of persecution. *Gui Ci Pan v. U.S. Att'y Gen.*, 449 F.3d 408, 412–13 (2d Cir. 2006). To warrant a different conclusion, an applicant must adduce objective evidence that the threat was so "'imminent or concrete,'" *id.* (quoting *Zhen Hua Li v. Att'y Gen.*, 400 F.3d 157, 165 (3d Cir. 2005)); or "'so menacing'" as itself to cause "'actual suffering or harm.'" *id.* at 413 (quoting *Lim v. INS*, 224 F.3d 929, 936 (9th Cir. 2000)). The absence of any such evidence here is itself substantial evidence supporting the agency's finding that Scarlett did not demonstrate actual past persecution by police supervisors. *See Shao v. Mukasey*, 546 F.3d 138, 157–58 (2d Cir. 2008) ("[W]hen a petitioner bears the burden of proof, his failure to adduce evidence can itself constitute the substantial evidence necessary to

19

support the agency's challenged decision." (internal quotation marks omitted)).

Because Scarlett failed to demonstrate past persecution, he was entitled to no presumption of future persecution. The agency reasonably concluded that the record did not otherwise support an objective fear of future persecution. Scarlett himself testified that his request to transfer out of Hewitt's squad in Denham Town was granted. He was reassigned to Guanaboa Vale, 20 miles away, where he worked for different supervisors without any difficulty. Moreover, in the year between that transfer and Scarlett's departure for the United States, he experienced no further problems from Hewitt, Harry J., or any other former supervisors, making it objectively unlikely that he would do so if removed to Jamaica more than a decade later. While Scarlett testified that Hewitt was subsequently disciplined and reassigned for misconduct of the sort ascribed to him by Scarlett, that did not compel the agency to find it objectively probable that Hewitt would persecute Scarlett if he were removed to Jamaica a decade later. *See Jian Xing Huang v. U.S. INS*, 421 F.3d 125, 129 (2d Cir. 2005) (characterizing asserted fear of future persecution lacking "solid support" in record as "speculative at best").

In sum, because Scarlett's professed fear of future persecution from former supervisors lacks any support in objective evidence, the agency committed no error in denying him withholding on this ground.

## B. Jamaican Gangs

Scarlett testified to past persecution by Jamaican gangs after his transfer to Guanaboa Vale. As detailed *supra* at 7–8, on two occasions—the first after Scarlett seized guns at the scene of a gang shootout, and the second after Scarlett, in the line of duty, killed the leader of the One Order gang—members of the Shower Posse gang drove by Scarlett's home, shouting that he was a "police boy" and not a "laborite," *i.e.*, not a supporter of the JLP, and threatening to kill him and burn down his home. Admin. R. 1497. On the second occasion, a gunshot was fired. After Scarlett was transferred to Bog Walk, police intelligence officers warned him that One Order gang members were, that same day, planning to kidnap Scarlett's daughter from school and to shoot up and burn down his home.

The IJ decided that these circumstances did not warrant withholding because (1) the gangs targeted Scarlett based on his performance of police duties and not a protected ground,[7] and (2) Scarlett had failed, in any event, to show that Jamaican authorities were unwilling or unable to protect him. In upholding the decision, the BIA did not review the first reason but, rather, assumed its resolution in Scarlett's favor. Nevertheless, the BIA concluded that the second reason alone warranted denial of withholding. Thus, that reason is the singular focus of our review. *See Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005) (explaining that BIA opinion provides

---

[7] Initially, the IJ rejected Scarlett's claim that gangs targeted him based on an imputed political opinion. *See supra* at 12–13. On remand, the IJ concluded that Scarlett had not been targeted based on membership in a cognizable social group of police officers with particular work experience. *See id.* at 13.

21

basis for judicial review); *Jin Yu Lin v. U.S. Dep't of Justice*, 413 F.3d 188, 191 n.4 (2d Cir. 2005) (holding that where BIA affirms based on one ground of IJ decision, without relying on alternative, error in latter does not provide ground for reversal or vacatur).

We identify two concerns with the agency's unwilling-or-unable determination: (1) whether it considered all relevant evidence, and (2) whether it applied the correct legal standard.

## 1. Relevant Evidence

"Despite our generally deferential review of IJ and BIA opinions," we require "a certain minimum level of analysis" to allow for meaningful judicial review. *Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir. 2005); *see Gashi v. Holder*, 702 F.3d 130, 138 (2d Cir. 2012). While the IJ and BIA need not "expressly parse or refute on the record each . . . piece of evidence offered by the petitioner," there must be some indication of "reasoned consideration" and "adequate findings." *Zhi Yun Gao v. Mukasey*, 508 F.3d 86, 87 (2d Cir. 2007) (internal quotation marks omitted); *see, e.g., Yan Chen v. Gonzales*, 417 F.3d at 272–73; *Tian-Yong Chen v. INS*, 359 F.3d 121, 128–29 (2d Cir. 2004) (vacating and remanding where BIA failed to consider petitioner's testimony that he had been beaten).

Applying these principles here, we note that the BIA concluded that two pieces of evidence defeated Scarlett's claim that authorities were unwilling or unable to protect him from gang violence: "the police [1] were able to warn [Scarlett] about impending harm to his family and [2] offered to transfer him to another location." Admin. R. 3. Such evidence may have sufficed to support an agency finding that Scarlett failed to show that Jamaican police were "unwilling" to

22

protect him from gang violence, but it provided little insight as to their *ability* to do so. *See Rosales Justo v. Sessions*, 895 F.3d 154, 163 (1st Cir. 2018) (recognizing willingness and inability as distinct issues); *Zelaya de Ceron v. Lynch*, 648 F. App'x 78, 79–80 (2d Cir. 2016) (remanding because agency failed to consider evidence that government had little control over gangs); *Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013) (identifying error where BIA "focused only on . . . government's willingness to control [gang], not its *ability* to do so" (emphasis in original)); *Hor v. Gonzales*, 421 F.3d 497, 501 (7th Cir. 2005) (explaining that while one "cannot even claim asylum on the basis of persecution by a private group unless the government either condones it or is helpless to prevent it, . . . if either of those conditions is satisfied, the claim is a good one").

In determining whether Scarlett satisfied the "unable" prong of the unwilling-or-unable standard, the agency needed to consider Scarlett's testimony that, although police warned him that his daughter was about to be kidnapped, they told him that he was "on [his] own" in protecting against the threat, and provided him with no assistance either in retrieving the child or finding a safe home for the family. Admin. R. 542. In fact, Scarlett's children never returned to school in Jamaica, and he and his family lived in hiding for several months until he was given permission to leave the country. None of these facts—all pertinent to whether Jamaican authorities, however willing, were nevertheless unable to protect Scarlett from gang violence—are mentioned in any of the various agency decisions.

Moreover, in citing the transfer offer as evidence of police willingness and ability to protect Scarlett, the agency nowhere mentions that Scarlett's Guanaboa Vale supervisor told him transfer

23

was the only thing police could do to protect him from gang violence. It was after—*i.e.*, despite—Scarlett's transfer from Guanaboa Vale to Bog Walk that gang members threatened to kidnap his daughter and burn his home. In short, it was after transfer proved ineffective in deterring gangs from targeting Scarlett that police told him he was on his own in responding to gang threats.

Reinforcing our concern with the agency's "reasoned consideration" of the totality of relevant evidence is the fact that the BIA, in rejecting Scarlett's claim that Jamaican police "did not have adequate resources to provide him protection," cited a single page of the IJ's decision to conclude that "the facts of the respondent's claim prove otherwise (I.J. 12)." Admin. R. 3 (stating that IJ's "finding in that regard is not clearly erroneous"). But the only pertinent "facts" referenced by the IJ on the cited page relate to the offered transfer to Bog Walk, which, as just indicated, proved insufficient to safeguard Scarlett and his family from threats of imminent gang harm. Moreover, the IJ may have mistakenly understood Scarlett to have rejected this transfer offer because he stated: "it does appear that the respondent was offered the opportunity to transfer to the [Bog Walk] division, *which the respondent did not wish to do.*" *Id.* at 315–16 (emphasis added). Insofar as the BIA opinion refers only to an "offer[]" of transfer, the misunderstanding may have persisted on appeal, particularly as the BIA does not acknowledge that the threat to kidnap Scarlett's child and burn his home occurred after actual transfer.

In sum, because we cannot conclude from the existing record that the agency gave reasoned consideration to all the facts relevant to assessing Scarlett's claim that Jamaican authorities were *unable* to

24

protect him from gang violence, we must remand for further proceedings.

## 2. Applicable Law

Scarlett further argues that the agency misapplied the law in reviewing his claim for withholding based on feared gang violence. We address those arguments to the extent necessary to provide the agency with adequate guidance on remand.

With no citation to supporting authority, Scarlett argues that the unwilling-or-unable standard is inapplicable to his withholding claim because Jamaican "gangs are so intertwined with the [nation's] political parties" that their members are government actors. *Pro Bono* Br. at 38. The argument fails. First, it is by no means evident from the record that Jamaica's political *parties* equate to the Jamaican *government,* the necessary predicate for Scarlett's argument. In any event, a close relationship between government officials and private persons may be probative of the formers' unwillingness or inability to control the latter, but the relationship alone does not transform the private persons into government actors. Thus, we conclude that the agency correctly recognized that for Scarlett to secure withholding based on feared gang violence he had to show that Jamaican authorities were unwilling or unable to control the gangs or to protect Scarlett from their violence.

As for Scarlett's legal challenges to how the agency applied the unwilling-and-unable standard to the facts of his case, we need not here decide which, if any, of these challenges has merit because, on remand, we expect the agency review to be conducted according to

25

the unwilling-or-unable standard as now clarified by the Attorney General in *Matter of A-B-*, 27 I. & N. Dec. 316.[8]

The Attorney General there explained that "'[p]ersecution is something a *government* does,' either directly or indirectly by being unwilling or unable to prevent private misconduct." *Id.* at 337 (quoting *Hor v. Gonzales*, 400 F.3d at 485 (emphasis in *Hor*)). Violence committed by non-government actors "[g]enerally . . . will not qualify" as persecution warranting relief from removal. *Id.* at 320 (making point with respect to "domestic violence or gang violence"). To warrant a different conclusion under the unwilling-or-unable standard, "[a]n applicant seeking to establish persecution based on [the] violent conduct of a private actor . . . must show that the government [1] condoned the private actions or [2] 'at least demonstrated a complete helplessness to protect the victims.'" *Id.* at 337 (quoting *Galina v. INS*, 213 F.3d 955, 958 (7th Cir. 2000)). As this formulation makes plain, the unwilling-or-unable standard requires an applicant to show more than government failure to "act[] on a particular report of an individual crime," or "'difficulty . . . controlling' private behavior." *Id.* (quoting *Menjivar v. Gonzales*, 416 F.3d 918, 921 (8th Cir. 2005) (quoting *Matter of McMullen*, 17 I. & N.

---

[8] The Attorney General's ruling was issued pursuant to authority conferred by 8 U.S.C. § 1103(a)(1) (stating that vis-à-vis DHS Secretary's administration and enforcement of all laws relating to immigration and naturalization, "ruling by the Attorney General with respect to all questions of law shall be controlling"); *see also* 8 C.F.R. § 1003.1(g)–(h)(1)(i).

Dec. 542, 546 (B.I.A. 1980))).[9]  The Attorney General observed that "[t]here may be many reasons why a particular crime is not successfully investigated and prosecuted." *Id.*  And no country, not even our own, "provides its citizens with complete security from private criminal activity."  *Id.* at 343.  Thus, to demonstrate persecution based on private party violence, an alien must show either that the government condoned the action or, even if it did not, that it was completely helpless to protect the victims.  *Id.* at 337.

It is "well settled" that principles of *Chevron* deference apply to the Attorney General's interpretation of the INA.  *Negusie v. Holder*, 555 U.S. 511, 516 (2009) (citing *Chevron, USA, v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984)).  As the Supreme Court has explained, such "judicial deference to the Executive Branch is especially

---

[9] For this reason, the Attorney General observed that claims for relief from removal based on feared domestic or gang violence would be unlikely to satisfy the unwilling-or-unable standard:

> Generally, claims by aliens pertaining to domestic violence or gang violence perpetrated by non-governmental actors will not qualify for asylum.  While I do not decide that violence inflicted by non-governmental actors may never serve as the basis for an asylum or withholding application based on membership in a particular social group, in practice such claims are unlikely to satisfy the statutory grounds for proving group persecution that the government is unable or unwilling to address.  The mere fact that a country may have problems effectively policing certain crimes—such as domestic violence or gang violence—or that certain populations are more likely to be victims of crime, cannot itself establish an asylum claim.

*Id.* at 320.

appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted); *accord Pierre v. Gonzales*, 502 F.3d at 116. In *Aguirre-Aguirre*, the Court was speaking of a "decision by the Attorney General to deem certain violent offenses committed in another country as political in nature, and to allow the perpetrators to remain in the United States." *INS v. Aguirre-Aguirre*, 526 U.S. at 425. But the Court's instruction applies with equal force here where the Executive is deciding when private misconduct will be denominated persecution by a foreign country's own government, a matter of no small significance to foreign relations.

Scarlett, nevertheless, argues that *Matter of A-B-* is not entitled to *Chevron* deference because the word "persecution" is unambiguous, and the Attorney General's interpretation of that word to require a showing of "complete helplessness to protect" is unreasonable in any event. *See Pro Bono* Br. at 28–31. Neither argument persuades.

As this court has recognized, the word "persecution" is subject to various definitions and, thus, sufficiently ambiguous to benefit from Attorney General clarification. *See Ivanishvili v. U.S. Dep't of Justice*, 433 F.3d 332, 340–41 (2d Cir. 2006) (collecting cases defining "persecution" in different ways). In any event, what the Attorney General clarifies in *Matter of A-B-* is not the severity of conduct constituting persecution, but a still more ambiguous aspect of that statutory term, *i.e.*, when private-party violence can be attributed to the government as its own "persecution" because of an unwillingness or inability to control it.

28

As for the reasonableness of *that* clarification, Scarlett suggests that the "complete helplessness to protect" formulation is a new, heightened requirement for the second prong of the "unwilling or unable" standard. It is not new. The formulation is well grounded in circuit precedents, not only the Seventh Circuit's decision in *Galina v. INS*, 213 F.3d at 958, expressly quoted in *Matter of A-B-*, 27 I. & N. Dec. at 337, but also *Saldana v. Lynch*, 820 F.3d 970, 977 (8th Cir. 2016) ("[A] government that is 'unable' to control criminal activity cannot mean anything and everything short of a crime-free society; the standard is more akin to a government that has demonstrated 'complete helplessness' to protect victims of private violence." (collecting cases)); and *Shehu v. Gonzales*, 443 F.3d 435, 437 (5th Cir. 2006) (holding that private violence "cannot be labeled 'persecution' absent some proof" that government "condoned it or at least demonstrated a complete helplessness to protect the victims" (internal quotation marks omitted)).

Nor does the formulation impermissibly heighten an applicant's burden. Insofar as Scarlett argues that *Matter of A-B-* requires an alien to demonstrate more than a well-founded fear of persecution to secure relief from removal, he conflates two inquiries. One asks whether the applicant's fear is well founded. The other asks whether what he fears is properly denominated "persecution." It is when an applicant's well-founded fear pertains to private violence that his ability to claim persecution depends on showing that the government is unwilling or unable to protect him against that violence. That burden did not arise with *Matter of A-B-*. *See Matter of Acosta*, 19 I. & N. Dec. 211, 222–23 (B.I.A. 1985) (discussing how "persecution" had long been understood to include harm or suffering

inflicted either by government or by entity that government was "unable or unwilling to control"). Rather, *Matter of A-B-* clarifies how to identify when a government is unwilling or unable to control private violence.

In reaching this conclusion, we join the Fifth Circuit, which also recently rejected an arbitrariness challenge to the Attorney General's clarification of the unwilling-or-unable standard in *Matter of A-B-*. *See Gonzales-Veliz v. Barr*, 938 F.3d 219, 233 (5th Cir. 2019). That court noted not only that a number of sister circuits already treated such a formulation as interchangeable with the standard, *see id.* (citing cases from Fifth, Seventh, and Eighth Circuits); *see supra* at 29, but also that the two serve "the same purpose: to show that an alien's home government has more than difficulty . . . controlling private behavior." *Id.* (internal quotation marks omitted). We agree.

In *Matter of A-B-*, the Attorney General instructs that "more than difficulty" can be identified in evidence that government officials "condone" the private violence, however tacitly. Implicit in a government's condoning of private violence is its unwillingness to control or protect against it, satisfying the first prong of the unwilling-or-unable standard. But even where the government does not condone private violence—indeed, even when it condemns it—*Matter of A-B-* clarifies that "more than difficulty" can still be identified in evidence of a government's "complete helplessness" to protect against the violence. The "complete helplessness" formulation thus ensures that a government is not charged with persecution for failing to provide a particular standard of protection, or for lapses in protection. At the same time, it serves to identify as persecutors governments that are actually unable to protect persons against

30

private violence, thus satisfying the second prong of the "unwilling or unable" standard.

In urging otherwise, Scarlett relies on *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018). Like the Fifth Circuit, we cannot agree with that case's reading of *Matter of A-B-*. *See Gonzales-Veliz v. Barr*, 938 F. 3d at 228. Specifically, we cannot agree with its conclusion that "no asylum applicant who received assistance from the government, regardless of how ineffective that assistance," could satisfy *Matter of A-B-*'s "complete helplessness" formulation. *Grace v. Whitaker*, 344 F. Supp. 3d at 129. A government that can offer its citizens only ineffective assistance is a government unable to protect them. Thus, nothing in *Matter of A-B-*'s "complete helplessness" formulation will foreclose aliens whose governments told them "we can't protect you," *Hor v. Gonzales*, 421 F.3d at 502; or offered them only ineffective assistance, *see Galina v. I.N.S.*, 213 F.3d at 958, from demonstrating persecution under the unwilling-or-unable standard. *See also Rosales Justo v. Sessions*, 895 F.3d at 166 n.9 (locating no departure from First Circuit precedent in *Matter of A-B-*'s treatment of unwilling-or-unable standard).

Accordingly, on remand, the agency should reconsider Scarlett's claim that Jamaican authorities were *unable* to protect him from gang violence by reference to the totality of the evidence consistent with this opinion and the Attorney General's decision in *Matter of A-B-*.

## III.    CAT Relief

Under Article 3 of the CAT, an alien cannot be removed "to a country where he more likely than not would be tortured by, or with

the acquiescence of, government officials acting in an official capacity." *Mu Xiang Lin v. U.S. Dep't of Justice*, 432 F.3d at 159. "Torture" is "an extreme form of cruel and inhuman treatment," 8 C.F.R. § 1208.18(a)(2), not incident to lawful sanctions, *see id.* § 1208.18(a)(3), and "specifically intended to inflict severe physical or mental pain or suffering," *id.* § 1208.18(a)(5). Scarlett argues that the BIA erred in denying him CAT relief based on the likelihood that he would be tortured by former supervisors or gang members if removed to Jamaica.

As to former supervisors, Scarlett's CAT claim merits little discussion. It fails for much the same reason as his parallel withholding claim because both rest on the same factual predicate. The same substantial evidence that supports the agency's finding that Scarlett failed to demonstrate a well-founded fear of persecution by former supervisors, *see supra* at 19–20, supports its finding that he failed to demonstrate likely torture by such officials. *See Xue Hong Yang v. U.S. Dep't of Justice*, 426 F.3d at 523 (upholding denial of CAT relief based on same factual predicate as failed asylum and withholding claims).

As to gang violence, Scarlett's CAT claim depends on his demonstrating government *acquiescence* in likely torture. This court has stated that acquiescence is demonstrated by evidence that "government officials know of or remain willfully blind to an act [of torture] and thereafter breach their legal responsibility to prevent it." *Khouzam v. Ashcroft*, 361 F.3d 161, 171 (2d Cir. 2004); *see* 8 C.F.R. § 1208.18(a)(7). Acquiescence is distinct from the specific intent required of the torturer himself. *See Pierre v. Gonzales*, 502 F.3d at 118 (explaining "*private* actor's behavior can constitute torture under the

CAT without a government's specific intent to inflict it if a government official is aware of the persecutor's conduct and intent and acquiesces in violation of the official's duty to intervene" (emphasis in original)).

In rejecting Scarlett's CAT claim, both the IJ and BIA concluded that Scarlett could not show government acquiescence in threatened gang torture because the police (1) offered Scarlett a transfer from Guanaboa Vale to Bog Walk, and (2) alerted Scarlett to gang threats against his family in time for Scarlett to respond. *See* Admin. R. 315–16, 1056. Two omissions preclude us from determining whether this analysis reflects reasoned consideration of Scarlett's CAT claim.

First, nowhere in the agency opinions do the IJ or BIA address what "legal responsibility" Jamaican authorities had to protect a serving police officer threatened with gang violence. Because it was Scarlett's burden to demonstrate acquiescence, it may well have been incumbent on him to show that police bore a legal responsibility to do more than transfer him to a different police location or warn him of imminent gang threats even after transfer.[10] Nevertheless, on the existing record, we cannot discern whether the agency found that Scarlett failed to carry his burden on the point of legal responsibility, or whether it failed to apply this part of the acquiescence standard all together.

---

[10] As noted *supra* at 24, the record suggests that the agency may have mistakenly thought Scarlett rejected the offered transfer and overlooked the fact that the threat to his family came after that transfer.

33

Second, the agency did not indicate how, if at all, evidence that Jamaican authorities were "unable" to fulfill their legal responsibility of protection might inform a determination about their "acquiescence" in threatened torture. As noted *supra* at 22–31, we cannot conclude from the record that the agency gave reasoned consideration to the issue of inability to protect, even with respect to Scarlett's withholding claim. In the CAT context, the Sixth Circuit has held that the fact that a "government is unable to control the gangs" threatening an applicant for CAT relief "does not constitute acquiescence." *Zaldana Menijar v. Lynch*, 812 F.3d 491, 502 (6th Cir. 2015). By contrast, the Third Circuit recently indicated that government inability to protect, while not dispositive of acquiescence, nevertheless did not foreclose such a finding. *See Quinteros v. Attorney Gen.*, 945 F.3d 772, 788 (3d Cir. 2019) ("[A]lthough not dispositive of whether a government acquiesced in torture through willful blindness, [a CAT] applicant may be able to establish governmental acquiescence in some circumstances, even where the government is unable to protect its citizens from persecution." (internal quotation marks omitted)). In *De La Rosa v. Holder*, 598 F.3d 103 (2d Cir. 2010), this court suggested only that a government's inability to protect does not necessarily preclude a finding of acquiescence. But in that case, the evidence showed that, although some police officers endeavored to protect De La Rosa from torture, other officers were actually complicit in the scheme. It was in that context that this court stated,

> Where a government contains officials that would be complicit in torture, and that government, on the whole, is admittedly incapable of actually preventing that torture, the fact that some officials take action to prevent the torture would seem neither inconsistent with a

34

finding of government acquiescence nor necessarily responsive to the question of whether torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity."

*Id.* at 110 (quoting Article 1, 1465 U.N.T.S. 85 (CAT), and citing 8 C.F.R. § 208.18).

In none of these cases, however, did the courts consider, much less decide, how the "unable" prong of the unwilling-or-unable standard, as applicable to withholding claims, might translate to identifying government acquiescence in torture under the CAT. We think that question is best left to the agency on remand, which can consider it with the benefit of the Attorney General's guidance in *Matter of A-B-*. *See Negusie v. Holder*, 555 U.S. at 517 ("When the BIA has not spoken on a matter that the statutes place primarily in agency hands, our ordinary rule is to remand to give the BIA the opportunity to address the matter in the first instance in light of its own expertise" (internal quotation marks omitted)); *Shu Ling Ni v. Board of Immigration Appeals*, 439 F.3d 177, 180 (2d Cir. 2006) (remanding for "agency to consider, in the first instance, whether petitioners should be afforded relief from removal under the CAT").

We here conclude only that, as with Scarlett's withholding claim, we must remand his CAT claim as it pertains to threatened torture by Jamaican gangs because we cannot conclude on the existing record that the agency gave reasoned consideration to all relevant evidence and all principles of law applicable to determining government acquiescence in such torture.

35

## CONCLUSION

To summarize, we conclude as follows:

(1) The BIA did not abuse its discretion in not allowing Scarlett to reopen his asylum proceedings based on former counsel's ineffectiveness in arguing that extraordinary circumstances excused the late asylum filing. The BIA reasonably concluded that Scarlett failed to show prejudice because no corroborating evidence supported the claimed extraordinary circumstances, much of the omitted evidence was duplicative of matters already in the record, and Scarlett could not demonstrate his own due diligence in pursuing asylum.

(2) The agency's decision to deny Scarlett withholding and CAT relief based on the conduct of former police supervisors is supported by substantial evidence that the past conduct did not rise to the level of "persecution," much less "torture," and there was no objective reason to fear likely future persecution or torture by such supervisors upon removal.

(3) The agency correctly recognized that Scarlett's entitlement to withholding based on gang violence depended on his showing that government authorities were unwilling or unable to protect him from such violence. Similarly, his entitlement to CAT relief on that basis depended on his showing government acquiescence in gang torture. Evidence of close connections between Jamaican gangs and political parties might inform the application of these

standards, but it does not relieve Scarlett of his obligation to satisfy them.

(4) On the existing record, we cannot conclude that the agency gave reasoned consideration to all relevant evidence of Jamaican authorities' inability to protect Scarlett from gang violence. Nor can we determine whether the agency applied the correct legal standard to that consideration in denying Scarlett both withholding and CAT relief. Thus, remand is necessary for further consideration of these claims.

(5) Insofar as the "unwilling or unable" standard applicable to Scarlett's withholding claim based on gang violence has recently been clarified by the Attorney General in *Matter of A-B-*, 27 I. & N. Dec. 316 (Att'y Gen. 2018), we direct the agency to apply that decision on remand, and we reject Scarlett's challenge to it. We do not decide whether *Matter of A-B-* might also inform a determination of whether Jamaican authorities acquiesced in gang torture, leaving that question to be considered, in the first instance, by the agency.

Accordingly,

(1) We GRANT Scarlett's petition for review of the challenged agency decisions;

(2) We AFFIRM the agency's denial of Scarlett's motion to remand for reopening of his asylum claim;

(3) We further AFFIRM the agency's denials of withholding of removal and CAT relief insofar as those claims relate to Scarlett's fear of his former supervisors in the Jamaican Constabulary Force;

37

(4) We VACATE the agency's denials of withholding of removal and CAT relief insofar as those claims relate to feared gang violence; and

(5) We REMAND for further consideration consistent with this opinion and *Matter of A-B-*, 27 I. & N. Dec. 316 (Att'y Gen. 2018).